Herman J. JONES, as Administrator of the Estate of Lawrence P. Jones, Deceased, Herman J. Jones and Genevieve Jones, Plaintiffs,

v.

UNITED STATES of America, Defendant.

UNITED STATES of America, Third-Party Plaintiff,

v.

HAWKES AMBULANCE SERVICE, INC., Third-Party Defendant.

HAWKES AMBULANCE SERVICE, INC., Fourth-Party Plaintiff,

v.

METROPOLITAN EQUIPMENT CORPORATION and Superior Coach Corporation, Fourth-Party Defendants.

No. 64 Civ. 977.

United States District Court
S. D. New York.

Aug. 7, 1967.

Lionel Alan Marks, New York City, for plaintiffs.

Robert M. Morgenthau, U. S. Atty., for Southern District of New York, New York City, for defendant and third-party plaintiff United States of America; Lawrence W. Schilling, Alan Blumberg, Asst. U. S. Attys., of counsel.

Joseph M. Soviero, New York City, for third-party defendant and fourth-party plaintiff Hawkes Ambulance Service, Inc.; Raymond C. Green, New York City, of counsel.

Edward L. Milde, New York City, for fourth-party defendant Metropolitan Equipment Corporation; Robert G. Burkhart, New York City, of counsel.

Berman & Frost, New York City, for fourth-party defendant Superior Coach Corporation; Abraham D. Shackton, Sheila L. Birnbaum, New York City, of counsel.

## OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW

WEINFELD, District Judge.

This is an action under the Federal Tort Claims Act[1] to recover damages for the death of plaintiffs' decedent, Lawrence P. Jones, allegedly caused by the negligent conduct of the Veterans Administration. The decedent was an employee of the Hawkes Ambulance Service, Inc.[2] (Hawkes), which had a contract with the Veterans Administration for the transportation of patients from its hospital at First Avenue and 24th Street, New York City to designated destinations. The contract provided for the services of a driver and attendant.

The Veterans Administration, with respect to patients in its custody or charge and known to be potentially dangerous, was required to exercise reasonable care to protect them from harming themselves or others.[3] The Administration is charged with breach of this duty. The circumstance that it contracted with a third party to transport its patients did not relieve it of its duty or exonerate it from liability in the event of a breach.[4]

The essence of the plaintiffs' claim is that the decedent met his death while acting as an attendant on Hawkes' ambulance during the transfer of one Paul Hefko, a mental patient who, according to plaintiffs' allegations, suddenly became violent and uncontrollable and threw the decedent out of the fast moving vehicle.[5] The Veterans Administration, its doctors and other personnel are charged with negligent conduct in that, aware of Hefko's mental condition and assaultive tendencies, they omitted, in arranging for his transportation, to take adequate precautions to restrain and to prevent him from injuring himself and others during the trip by their failure (1) sufficiently to tranquilize Hefko, (2) to use necessary physical restraints, and (3) to provide sufficient and experienced attendants.

1. 28 U.S.C. §§ 1346(b), 2671–80.

2. The United States of America, in the event it is held liable to plaintiffs, seeks indemnity from Hawkes Ambulance Service, Inc., third-party defendant, for alleged breach of express and implied obligations of the contract and on common-law grounds. Hawkes, in turn, in the event it is held liable to the United States of America, seeks indemnity from two fourth-party defendants, Superior Coach Corporation, which manufactured the ambulance, and Metropolitan Equipment Corporation, Superior's local dealer who sold it to Hawkes, under various claims of breach of contract, express and implied.

3. Jones v. State, 267 App.Div. 254, 45 N.Y.S.2d 404 (3d Dep't 1943); Weihs v. State, 267 App.Div. 233, 45 N.Y.S.2d 542 (3d Dep't 1943).

4. See Restatement (Second), Torts § 413 (1965). Cf. Benson v. State, 52 N.Y.S. 2d 239 (Ct.Cl.1944).

5. Paragraph 6 of the Complaint alleges " * * * the patient suddenly became violent and uncontrollable and did assault the deceased * * * in the rear compartment of the ambulance and did thrust [the deceased] out of the door of the moving ambulance, causing fatal injuries. * * * "

Thus, the two basic inquiries are (1) was the Veterans Administration negligent, and (2) if so, was that negligence the proximate cause of the decedent's death.

On March 25, 1963 at about 10:00 a. m. the patient, Paul Hefko, who had a history of mental illness for which he had previously been treated at Veterans Administration hospitals, applied for treatment at the hospital maintained by the Administration at 24th Street and First Avenue, New York City. While awaiting examination and thereafter, Hefko committed various assaultive and resistant acts. Dr. Milton Reisner, the examining psychiatrist, formed the impression that Hefko was suffering from a schizophrenic reaction, chronic paranoid type with acute exacerbation. He considered Hefko potentially dangerous to himself and others. After determining that Hefko required hospitalized psychiatric treatment, he directed his transfer to the Veterans Administration Hospital at Northport, Long Island. At about 1:30 p. m., on the doctor's instruction, Hefko was given an intra-muscular injection of 50 milligrams of Thorazine, intended to calm and tranquilize Hefko for a period of three or four hours. Dr. Reisner's judgment was that the injection, plus the service of one qualified ambulance attendant to accompany Hefko on the trip to Northport, was adequate to assure his transfer without incident.

The ambulance to transport the patient, supplied by Hawkes under the contract with the Veterans Administration, arrived at the hospital at about 2:45 p. m. The driver was Michael LoMauro. He was accompanied by Lawrence P. Jones, then two months from his eighteenth birthday, who was to serve as the attendant on the trip. Jones had been in the employ of Hawkes only eleven days and was without training, education or experience as an ambulance attendant or in the handling of potentially assaultive mental patients. He had been engaged by Hawkes as an apprentice "oxygen technician".

Two hospital employees, Williams and Rogers, whose duties related to the transfer of the patient to the waiting ambulance, observed Jones' youthful appearance, were aware of his inexperience, and expressed doubt to LoMauro that Jones was competent to act as an ambulance attendant during the transfer of Hefko to the Northport hospital, but they failed to call this to the attention of the supervisory or medical personnel. LoMauro, who had been advised that the patient had been sedated and probably would go to sleep during the trip, felt the situation could be handled. Prior to departure Hefko was not restrained by any physical device, such as a camisole, cuffs or straps. Dr. Reisner, who was in charge, did not deem these restraints necessary. Hefko at this time was calm; he walked to and entered the ambulance unaided. He sat in the rear seat facing forward; the door to his right was forward of him. Jones sat directly opposite, facing Hefko. Their seats were about three and a half feet apart. The right rear door was to Jones' left. LoMauro closed the right side door from the outside without depressing the lock plunger and started on his way to Northport, a trip of about one hour.

On the question of whether adequate and proper safeguards were taken by defendant's agents to protect others, as well as the patient himself, from injury during the course of the journey, I find that the injection of 50 milligrams of Thorazine was of sufficient dosage to keep Hefko calm during the trip; that Hefko's condition did not require the use of physical restraints upon him during the trip, particularly since the policy of the Veterans Hospital at New York was against their use unless absolutely required, because generally they induced resistance and assaultive conduct by the patient, which policy accorded with accepted and approved mental hospital procedure in this Metropolitan area.

I find, however, that the defendant was negligent in allowing the trip to be undertaken without a trained, experienced ambulance attendant, and that Jones was not such a trained attendant, of which the defendant was aware. The administra-

tion of Thorazine alone, while adequate in the judgment of Dr. Reisner to keep the patient calm for a period of three or four hours, was not by itself a sufficient safeguard. There was and there could be no certainty that its effectiveness would not be diminished during the trip. It was foreseeable that the Thorazine by itself would not serve as an adequate restraint upon the patient. Indeed it was not so intended by Dr. Reisner. The fact is that he assumed that a qualified attendant would accompany the patient on the trip. The finding that the defendant was negligent brings us to the next question, was such negligence the proximate cause of the decedent's death. Here we turn to the only testimony as to what transpired immediately before the accident.

LoMauro, the driver of the ambulance, testified that the trip was without incident until about 3:45 p. m., when he was proceeding on the Northern State Parkway toward his destination. He then looked in his rear-view mirror and saw Jones standing somewhat stooped over with his back to LoMauro. LoMauro, thinking something was wrong, called to Jones and simultaneously started to pull over to the right side of the road, hitting his brakes. At that instant, in a split second, LoMauro saw Jones go out of the right rear door, somehow flying out onto the roadway. When the ambulance was brought to a halt, it was found that Jones had sustained severe head and other injuries, which resulted in his death the next day.

LoMauro did not know whether Jones was standing in the well that was about two feet below the level of the floor of the car. When LoMauro swerved the ambulance over to the right he was traveling at a speed of from 45 to 50 miles per hour. He further testified that he neither saw Hefko away from his seat nor saw him do anything with respect to Jones. LoMauro swore that he did not see Hefko throw decedent out of the ambulance. He denied he ever told anyone that he saw Hefko push Jones out of the ambulance. He conceded that in the excitement after the accident he may have told the police officer and an official at the Northport hospital he "thought" or "guessed" the patient had done so, but actually he did not know. A police officer who arrived at the scene of the accident soon after its occurrence testified that Hefko was sitting on the step of the ambulance calmly smoking a cigarette. Even accepting as admissible evidence LoMauro's post-accident out-of-court statements tendered by plaintiffs, some allegedly made to kin of the decedent, such statements, rather than impeaching him, with but one exception appear consistent with his trial testimony.

The essential question is whether this witness told the truth upon the trial. I am impressed that he did. I am persuaded that his trial testimony that he did not know how the accident occurred or what caused the decedent to fly out of the door of the fast moving vehicle, and that he did not see the patient assault or do anything with regard to Jones, is truthful.

■■ The plaintiffs, to prevail, must establish not only the defendant's negligence, but also "facts and conditions from which * * * the causation of the accident by that negligence may be reasonably inferred." [6] The court finds that the plaintiffs have failed to sustain their burden of proof that the defendant's negligent conduct was the proximate cause of the decedent's death. There is no probative evidence to support plaintiffs' charge that Jones was assaulted by the patient or thrown out by Hefko or was thrown from the ambulance as a result of any act of the patient. To find otherwise upon the evidence here presented, or perhaps more correctly, upon the lack of evidence, would require the court to enter into the realm of speculation and to engage in sheer guesswork.

The plaintiffs stress that under New York's *Noseworthy* doctrine they are "not held to as high a degree of proof of the cause of action as where an injured plain-

6. Ingersoll v. Liberty Bank of Buffalo, 278 N.Y. 1, 7, 14 N.E.2d 828, 830 (1938).

tiff can himself describe the occurrence. * * *." [7] Accordingly, they urge as a reasonable inference that during the ambulance ride Hefko's paranoid schizophrenic condition manifested itself and he assaulted the decedent or committed other hostile acts, and that in the absence of restraints, "the patient's hostile conduct caused * * * Jones to stand over Hefko in an effort to keep Hefko back in his seat and avoid his acts * * * and in doing so he went through the ambulance door" [8]—incidentally, a theory somewhat different from that originally alleged and advanced upon the trial that Hefko threw Jones out of the moving automobile after assaulting him.[9] The facts upon which the inference is urged are that before the fateful journey started the patient had assaulted several of the personnel at the hospital and that shortly after the accident when the journey was resumed, and the patient had been handcuffed, his right hand to an upright post, his left hand to a metal stretcher, he lunged forward toward the police officer who had been assigned to accompany him but was restrained by the handcuffs and kicked or stamped his feet up and down and then was pushed back into his seat by the police officer. This contention must be viewed against the background of all the facts in their proper setting, including that LoMauro, who observed the patient at all times in his seat, did not see him take any untoward action with respect to the decedent. The prior assaults at the hospital had occurred some two and a half hours before the accident, following which the patient had been sedated and, as already observed, he was calm when he entered the ambulance unaided. Also, immediately after the accident Hefko was found by the police officer in a calm state. The very fact that he was handcuffed in sort of a spread-eagle fashion following the accident suggests an incitement to resentment and resistance and an attempt by Hefko to free himself from the cumbersome restraint—the very reason underlying the Veterans Administration policy against physical restraint except under the most compelling circumstances.

Upon the evidence, other probabilities, of equal if not stronger force than the inference urged by the plaintiffs, suggest themselves as the cause of the accident. The automatic electric safety lock of the ambulance had malfunctioned for some time before the accident. Following the accident the door was sprung and could not be closed securely. The plunger, ordinarily used to lock the door of the car, was not pushed down at the start of the journey. As the ambulance sped along at 45 to 50 miles per hour, followed by a sudden and sharp turn to the right, when LoMauro hit the brakes, as he testified, the door may have swung open. The sharp turn or the simultaneous braking may have caused this.

It is also not beyond the realm of reasonable probability that the decedent himself, who was seated closer than Hefko to the handle of the door, somehow came into contact with the door handle, which by itself could be sufficient to open the door when the electric lock system was not working, causing the door to open, and fell out as the ambulance suddenly swerved; also, upon the sudden movement of the vehicle, to hold his balance, he may have reached out for something and grabbed onto the handle and thus unlocked the door. Other probabilities, not unreasonable in the light of the evidence, suggest themselves as to the cause of the accident.[10]

■■ This court is not unaware of the force of the *Noseworthy* doctrine and has not hesitated to apply it where the basic facts warrant a permissible inference.[11] However much *Noseworthy*,

7. Noseworthy v. City of New York, 298 N.Y. 76, 80, 80 N.E.2d 744, 746 (1948).

8. Plaintiffs' Proposed Finding 44.

9. Complaint, ¶ 6.

10. Cf. Ingersoll v. Liberty Bank of Buffalo, 278 N.Y. 1, 7, 14 N.E.2d 828 (1938).

11. Klepal v. Pennsylvania R.R. Co., 129 F.Supp. 668 (S.D.N.Y.1955), aff'd, 229 F.2d 610 (2d Cir. 1956).

where applicable, may lighten a plaintiff's burden, it does not relieve him of establishing the basic facts, direct or circumstantial, either alone or in combination, upon which the inferences of negligence or proximate cause, as the case may be, may reasonably be drawn by the fact finder.[12] And conjecture and surmise are not permissible substitutes for proof of the basic facts upon which the inferences may be drawn.[13] However unfortunate this accident, plaintiffs, like all other plaintiffs, may not recover unless the reasonable inferences to be drawn from the facts establish by a fair preponderance of the evidence the essential elements of their claim—negligence and causal relationship. And "where an accident is one which might naturally occur from causes other than a defendant's negligence, the inference of [proximate cause] is not fair and reasonable."[14]

The court has scanned the record thoroughly to find some evidence to give factual support to the plaintiffs' theory that the decedent's death was caused by acts or conduct on the part of the patient, but finds no rational basis therefor. That some hours before the accident the patient, when untranquilized, engaged in hostile acts, and shortly after the accident, when the ambulance resumed its journey, he, but again under entirely different circumstances, struggled against the physical restraints, do not establish that while in the ambulance he committed hostile acts that led to the decedent's death.

The complaint is dismissed upon the merits and judgment rendered in favor of the defendant. It necessarily follows that the various third and fourth party claims must also fail.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

12. Cole v. Swagler, 308 N.Y. 325, 329, 125 N.E.2d 592 (1955); Wank v. Ambrosino, 307 N.Y. 321, 121 N.E.2d 246 (1954).

13. Cf. Johnson v. Beyer, 2 N.Y.2d 762, 157 N.Y.S.2d 971, 139 N.E.2d 149 (1956); Digelormo v. Weil, 260 N.Y. 192, 197, 183 N.E. 360 (1932).

14. Cf. Cole v. Swagler, 308 N.Y. 325, 331, 125 N.E.2d 592, 596 (1955).